Opinion by Judge NOONAN; Partial Concurrence and Partial Dissent by Judge TASHIMA; Partial Concurrence and Partial Dissent by Judge CALLAHAN.
ORDER
The Opinion filed March 11, 2010 is withdrawn. A new Opinion is filed herewith.
With the new Opinion, the government’s petition for panel rehearing is DENIED. Judge Callahan would grant the government’s petition for rehearing.
The panel votes to deny Tijani’s petition for panel rehearing. Judge Callahan votes to deny the petition for rehearing en banc and Judge Noonan so recommends. Judge Tashima recommends granting the petition for rehearing en banc.
The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote whether to rehear the matter en banc. Fed. R.App. P. 35.
Tijani’s petition for rehearing is DENIED and his petition for rehearing en banc is DENIED.
No further petitions for rehearing and for rehearing en banc will be entertained.
OPINION
NOONAN, Circuit Judge:
Monsuru Olasumbo Tijani, a native and citizen of Nigeria, petitions for a review of a decision of the Board of Immigration Appeals (the BIA), affirming a decision by *1073 an immigration judge ordering his removal and denying him asylum. Central to the ease is the place of credit in our economy. To the unsophisticated and sometimes to the sophisticate, the nature of credit is a mystery. It is not animal, mineral or vegetable. It is not real property. It is not a chattel. It is not money. Yet it is not a vapor. The one who uses it becomes a debtor, but becomes a debtor empowered to acquire wealth. The one who grants it, the creditor, puts his own wealth at risk.
Credit comes into existence through confidence — confidence that one human being may rely on the representations of another human being. On this utterly unmechanical, uniquely human understanding, a credit economy is formed and wealth is created. To exploit, pervert and destroy the confidence that creates credit is a vicious act. The abuse of the distinctively human capacities to reason and to engage in rational speech, using these capacities to harm another human, may well be considered an act of moral turpitude.
That, at least, is the conclusion most people in this country wnuld reach once they knew the facts. Credit is today the most widespread means of acquiring wealth in this country. To suppose that it is not fraud to try to tap into this wealth by lies is to ignore the economic elements of the modern world. Credit card fraud not fraud? No, in the modern United States it is the paradigm of fraud.
FACTS
Tijani was born in Lagos, Nigeria on October 19, 1965. He entered the United States in 1982 on a student visa. He adjusted his status to lawful permanent resident in 1985. He was a student at California State University at Sacramento from 1982 to 1985 and has held several jobs in information technology and in biomedical laboratories. He is now married to a citizen of the United States.
In 1986, the year after he achieved the status of lawful permanent resident, Tijani was convicted of perjury in violation of CahPenal Code § 118 and of grand theft in violation of CahPenal Code § 487; he was sentenced to three years probation. The next year, 1987, he was convicted of passing fraudulent checks in violation of CahPenal Code § 476a(a) and sentenced to one and one third years imprisonment.
As a result of these felony convictions, the Immigration and Naturalization Services (now the Department of Homeland Security (DHS)) placed Tijani in deportation proceedings. He applied for a waiver of inadmissibility, submitting a letter on the letterhead of the Brotherhood of the Cross and Star, with its world headquarters indicated as Calabas, Nigeria, and its local headquarters indicated as Los Angeles. The letter was signed by “Pastor O.J. Omogi” and stated that Tijani had been a practicing member of this Christian church for two years. In 1989, an immigration judge granted the waiver.
Two years later, in 1991, Tijani was convicted of violating CahPenal Code § 532a(l) by providing false information to obtain credit cards and using the cards to obtain goods; he was sentenced to prison for one and one-third years. One month later, on January 3, 1992, he was again convicted of filing false statements and had his prison sentence doubled.
On June 9, 1999; Tijani was convicted of twelve counts under the same section of the criminal law which he had been found in 1991 and 1992 to have violated; the crimes this time had been committed between June 1996 and July 1998. This time he was sentenced to prison for nine years and ordered to pay $27,793.71 in restitution.
PROCEEDINGS
In 2003, Tijani was charged with being removable as an alien convicted of an ag *1074 gravated felony and two crimes of moral turpitude under 8 U.S.C. § 1227(a)(2)(A)(ii) and (iii), respectively. He applied for asylum, withholding of deportation, and other relief. He testified that, brought up a Muslim, he had become a Christian in 1994 and that, on returning to his mother’s village in 1995, to her consternation he revealed his change of religion. She told neighbors, who told the Sharia police, who paid him a visit at her house and reproached him for his apostasy from Islam. He was struck on the head, a blow requiring seventeen stitches to repair and leaving a scar. He was summoned to explain his apostasy in court, but fled Nigeria three days after the incident.
Prior to his removal hearing before the immigration judge in El Centro, California, Tijani filed a pro se motion for change of venue of the removal proceeding to San Francisco. The immigration judge denied his request.[1]
The immigration judge found the charges against Tijani true, rendering him removable. He found that the 1991 and 1999 convictions were crimes of moral turpitude and that the 1999 conviction was an aggravated felony. The immigration judge further found Tijani’s credit card frauds to be particularly serious crimes, hurtful to the credit structure on which the economy of the United States exists. The immigration judge ruled that considering the multiple lies to which his convictions witnessed and also the conflict between his story of his change of religion and the account given in Pastor Omogi’s letter, the immigration judge had “reason not to believe him.” The immigration judge did explicitly refuse to rule that Tijani was not credible, reasoning that he could “not find an inconsistency in [Tijani’s] testimony ... to say that he [was] not credible.” At the same time, the immigration judge found “his words deserve no weight,” and described him as the Boy Who Cried Wolf. The judge concluded that Tijani had failed to prove eligibility for asylum, withholding of removal, or relief under the Convention Against Torture (“CAT”).[2] The judge also held that if Tijani was eligible for asylum, asylum was denied as a matter of discretion.
The BIA, using its streamlined procedure, affirmed the immigration judge’s decision without opinion. Tijani petitions for review.
JURISDICTION
We have jurisdiction to review the questions of law presented by Tijani’s petition. Fernandez-Ruiz v. Gonzales, 410 F.3d 585, 586-87 (9th Cir.2005), as adopted by Fernandez-Ruiz v. Gonzales, 466 F.3d 1121, 1124 (9th Cir.2006) (en banc). Among these questions are whether Tijani has been convicted of crimes of moral turpitude and whether he was required to corroborate his own testimony.
ANALYSIS
On this appeal, we must decide, first, whether the crimes of Tijani, a lawful permanent resident, made him removable. *1075 Second, we must decide whether, if removable, he has established his claim for relief.
The Crimes. Tijani’s string of crimes consisted in credit card fraud in violation of CaLPenal Code § 532a(l) — a modern form of swindle particularly tempting because of the ease and the impersonality with which the crime may be carried out. Do they constitute removable offenses? The government argues that the BIA correctly affirmed the IJ’s decision holding that Tijani’s 1991 and 1999 convictions are crimes involving moral turpitude. It also argues that the 1999 conviction is an aggravated felony.
To determine whether a conviction constitutes a removable offense, this court applies the approach set out in Taylor v. United States, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990); Gonzales v. Duenas-Alvarez, 549 U.S. 183, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007). Counterfactual and counterintuitive though it often appears to be, we do not consider the particular facts of the convictions. We first ask whether the “full range of conduct” proscribed by CaLPenal Code § 532a(l) meets the definition of a crime involving moral turpitude or an aggravated felony. Nicanor-Romero v. Mukasey, 523 F.3d 992, 999 (9th Cir.2008) (“The issue is not whether the actual conduct constitutes a crime involving moral turpitude, but rather, ‘whether the full range of conduct encompassed by the statute constitutes a crime of moral turpitude’ ”). If the crime does prohibit conduct that does not necessarily involve moral turpitude, we turn next to the modified categorical approach, under which “We look beyond the language of the statute to a narrow, specified set of documents that are part of the record of conviction, including the indictment, the judgment of conviction, jury instructions, a signed guilty plea, or the transcript from the plea proceedings.” Id. at 1007 (citation omitted).
Section 532a(l) provides:
Any person who shall knowingly make or cause to be made, either directly or indirectly or through any agency whatsoever, any false statement in writing, with intent that it shall be relied upon, respecting the financial condition, or means or ability to pay, of himself, or any other person, firm or corporation, in whom he is interested, or for whom he is acting, for the purpose of procuring in any form whatsoever, either the delivery of personal property, the payment of cash, the making of a loan or credit, the extension of a credit, the execution of a contract of guaranty or suretyship, the discount of an account receivable, or the making, acceptance, discount, sale or indorsement of a bill of exchange, or promissory note, for the benefit of either himself or of such person, firm or corporation shall be guilty of a public offense.
Tijani has argued that his convictions do not constitute crimes involving moral turpitude. His argument appears foreclosed by the frauds of which he stands convicted. The law is that “to be inherently fraudulent, a crime must involve knowingly false representation to gain something of value.” Navarro-Lopez v. Gonzales, 503 F.3d 1063, 1076 (9th Cir.2007) (en banc).
When this standard is applied, any conviction under the California statute involves fraud; that is, the crime is committed by making a false statement with the intent that it be relied upon to obtain “the delivery of personal property, the payment of cash, the making of a loan or credit. ..CaLPenal Code § 532a(l). Fraud is implicit in the nature of a crime under section 532a(l). The statute of conviction does not explicitly list intent to defraud as an element. But we have held that “[ejven if intent to defraud is not explicit in the *1076 statutory definition, a crime nevertheless may involve moral turpitude if such intent is implicit in the nature of the crime.” Carty v. Ashcroft, 395 F.3d 1081, 1084 (9th Cir.2005). A crime under § 532a(l) is committed only when a person by a knowing falsehood obtains property, money, or credit. The fraudster intentionally seeks and obtains something of value by means of his misrepresentation. See Tall v. Mukasey, 517 F.3d 1115, 1119 (9th Cir.2008).
Our dissenting colleague makes this argument as to the elements of the California crime:
As the BIA recognized in In re Kinney: “The intent that the false statement be relied upon is not necessarily an intent to do evil or work fraud because ... one who intends that there be reliance upon his false statement may nevertheless also intend to pay for the goods he is attempting to obtain.” 10 I. & N. Dec. at 549 (citations omitted).
The same benevolent interpretation could be extended to a borrower misrepresenting his credit-worthiness to a bank to get a loan: “I’ll get rich and pay it all back, the bank will benefit by my chicanery.” No court would accept such a defense. The intent of the fraudster is evil: to get what he has no right to get. The California Court of Appeal has rejected this same defense in analyzing California’s law of false pretenses, which does explicitly require an intent to defraud:
[T]he fraudulent intent contemplated by the statute is the intent by the use of false representations to induce another to part with his property when otherwise he would not have done so ... therefore, when the property is obtained under such circumstances, neither the promise to repay, the intention at the time to make the aggrieved party whole, nor repayment, will relieve the false and fraudulent act in obtaining the property of its criminality.
People v. Hand, 127 Cal.App. 484, 16 P.2d 156, 158 (1932), citing People v. Wieger, 100 Cal. 352, 34 P. 826 (1893) and People v. Bowman, 24 Cal.App. 781, 142 P. 495 (1914).
Even if we were to accept the dissent’s argument, it would be inapplicable in Tijani’s case under the modified categorical approach. The mistaken argument is that Tijani’s conviction did not necessarily require an intent to defraud. The information filed in Tijani’s 1999 case shows that he was charged specifically with making false statements to procure “the extension of credit,” not goods or cash. Two assumptions are concealed in dissent’s argument where it is applied to a credit-seeker: (1) that the lying credit-seeker has not obtained something of value when he gets credit and (2) that the lying credit-seeker harbors no evil intent to deprive the creditor of anything. Each assumption is fallacious.
Creditors, like investors, transact in risk. An investor who, as a result of a person’s misrepresentations, receives a riskier asset than he bargained for, has suffered measurable and foreseeable economic harm, and is the victim of fraud. Similarly, the creditor who is induced through misrepresentations to give credit suffers measurable and foreseeable harm the moment the creditor enters into the transaction with the fraudster.
The harm is inflicted regardless of whether the customer intends to make timely payments or whether or not he eventually makes them. The creditor’s contract with the customer has more than one parameter. Creditors extend a particular line of credit, including a specific credit limit, a specific interest rate, and particular provisions for late fees and penalties, based on the calculated credit-worthiness of a specific customer. A credit-seeker who misrepresents his credit-worthiness *1077 does so precisely with the intent of receiving a higher credit limit, a lower interest rate, lower monthly payments, and more favorable late-fee and penalty provisions than he otherwise would — at the expense of the creditor. The creditor, in this situation, receives a riskier and less valuable investment than that bargained for, and therefore suffers measurable and foreseeable economic harm. He has been defrauded.
The current economic crisis highlights the full impact of the misrepresentation of risk in the credit market. The impact is on creditors, consumers, and on the economy. When creditors take on too many risky contracts, whether due to their own carelessness or the misrepresentations of their customers, they are likely to suffer enormous economic harm, and the resulting effects on society can be devastating. Any assessment of the pecuniary harm suffered by the creditor of a fraudster will be incomplete if it is divorced from these economic realities.
In a word, to induce a creditor into a risky contract through misrepresentation, on terms to which the creditor would not have agreed if he had not been duped, is to commit fraud on the creditor. Precisely this type of conduct is prohibited under § 532a(l). Tijani’s conduct was “inherently fraudulent.”
Further fraud is committed when the fraudster uses his fraudulently-obtained credit card to obtain goods. The seller of the goods is now the victim. The seller parts with property in return for a representation of credit to which the fraudster has no right. The harm is tangible and immediate.
The argument might be advanced that fraudulently using the card to obtain goods is not fraud on the merchant because he will be paid by the issuer of the card. But at the moment the merchant delivers the goods, he has parted with property on the basis of a lie: that is the fraud. That the merchant will be reimbursed is no more relevant than is insurance to the victim of a theft; the reimbursement does not mean that the victim was not deprived of his property. What is secured by the fraudster is the property he purchases. To argue that it is not fraud to obtain property by falsehood if one harbors the intent to pay for it at some future time is to suppose that any prosecution for fraud could be defeated by the swindler saying “I intended to pay all along and will now do so.” We held in a federal case involving fraud: “While an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all.” United States v. Benny, 786 F.2d 1410, 1417 (9th Cir.1986).
When argument suggests that an intent to repay is a defense to a charge of fraud, it confuses a practical possibility with a legal defense. Of course if the fraudster does in fact pay his bills, he is probably not going to be prosecuted. Who would turn him in? His upright intent to repay does not absolve him of the lie by which he obtained what was not his. It is contended that the creditor could benefit from the fraud when the honest fraudster paid up. But no sane giver of credit would want to be lied to and be persuaded to make credit available or to deliver his goods on the basis of the lie. Any benefit that came from the fraudster turning honest would be a matter of chance.
It is argued that our reading of § 532a(l) makes another section of the same statute, 532(a), redundant. This section criminalizes the act of one who “knowingly or designedly, by any false or fraudulent representation or pretense, defrauds any other person of money, labor, or property, whether real or personal ... and *1078 thereby fraudulently gets possession of money or property, or obtains the labor or service of another.... ” Cal.Penal Code § 532(a). This statute does not specify fraud in obtaining credit. Therefore, § 532(a) is not otiose. It criminalizes only fraud to obtain labor, money or property. Section 532a(l) aims at fraud in obtaining credit.
Tijani cites People v. Hagedorn, 127 Cal. App.4th 734, 25 Cal.Rptr.3d 879 (Cal.Ct. App.2005), applying Cal.Penal Code § 530.5(a) which criminalizes the use of another person’s identity “for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information.... ” For conviction under the statute, the court held an intent to defraud was not necessary. Id. at 742, 25 Cal.Rptr.3d 879. But this case merely shows that identity theft is a crime that may not involve fraud. The statute criminalizes identity theft for “any unlawful purpose.”
Berry v. Am. Express Publ’g, Inc., 147 Cal.App.4th 224, 54 Cal.Rptr.3d 91, 94 (2007) is worth comment. The question in this civil suit was whether a credit card was covered by the Consumer Legal Remedies Act (CLRA), Cal. Civil Code § 1750 et seq. The court held that the card fell neither within the definition of goods nor services, the two types of property protected by the CLRA. The court further noted that the legislature had dropped “money” and “credit” from what the CLRA protected. Berry does not show that credit is valueless in California; rather, the case establishes that credit is a distinct kind of valuable.
Tijani calls our attention to Hirsch v. INS, 308 F.2d 562 (9th Cir.1962), which distinguished a fraudulent statement from a false one. The distinction is that a false statement could be made without the intent to induce reliance. The distinction does not help Tijani. Section 532a(l) prohibits only false statements made in the expectation that credit or property will be given in reliance on them. Tijani’s false statements were made for that purpose.
Marmolejo-Campos. Finally, we disagree with Judge Tashima’s assertion that our recent decision in Marmolejo-Campos v. Holder, 558 F.3d 903 (9th Cir.2009) (en banc) requires that we direct the BIA to adhere to its decision in In re Kinney, 10 I. & N. Dec. 548 (1964). Our decision in Marmolejo-Campos is inapposite to this petition and the contrary suggestion opens the door to considerable mischief. Marmolejo-Campos concerned the deference this court should give a BIA opinion when reviewing a challenge to a BIA decision. We clarified that, pursuant to Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), “where ... the board determines that certain conduct is morally turpitudinous in a precedential decision, we apply Chevron deference.” 558 F.3d at 911. We concluded that “once the elements of the petitioner’s offense are established, our review of the BIA’s determination that such offense constitutes a ‘crime of moral turpitude’ is governed by the same traditional principles of administrative deference we apply to the Board’s interpretation of other ambiguous terms in the INA.” Id.
The first step is that “the elements of the petitioner’s offense be established.” To establish the elements is to construe the statute of conviction. As we said:
The first inquiry requires the BIA to construe a state criminal statute. As the BIA has no statutory expertise in such state law matters, we review de novo its determination of the elements of the offense for which the petitioner was convicted. [2] The second inquiry requires the BIA to construe the INA by defining a particular removable of *1079 fense and applying that definition to a petitioner’s state conviction. If, in resolving the second issue, the BIA has interpreted an ambiguous INA statutory term, and rendered its interpretation in a precedential decision intended to carry the force of law, we defer under Chevron U.S.A [], to the BIA’s definition so long as it is reasonable.
See Fregozo v. Holder, 576 F.3d 1030, 1034-35 (9th Cir.2009) (citing MarmolejoCampos ) (citations and internal quotations omitted).
As the Marmolejo-Campos court explained:
It is well established that we give no deference to the BIA’s answer to the first question. The BIA has no special expertise by virtue of its statutory responsibilities in construing state or federal criminal statutes and, thus, has no special administrative competence to interpret the petitioner’s statute of conviction. As a consequence, we review the BIA’s finding regarding the specific act for which the petitioner was convicted de novo.
Marmolejo-Campos v. Holder, 558 F.3d 903, 907 (9th Cir.2009)
Deference is not due the agency in construing state law. We determine that an element of the California statute is fraud. Once that is determined, the conclusion is clear: “Crimes involving fraud are considered to be crimes involving moral turpitude.” Matter of Correa-Garces, 20 I. & N. Dec. 451, 453 (BIA 1992).
The erroneous exposition of the elements of the crime in Kinney is not binding upon us. Kinney contains the proposition that credit card fraud is not fraud because the fraudster might harbor the intent to repay the credit he fraudulently acquires. That proposition, as our preceding analysis has demonstrated, is contrary to the law. Moral turpitude attaches to the fraud. “Without exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude.” Jordan v. De George, 341 U.S. 223, 227, 71 S.Ct. 703, 95 L.Ed. 886 (1951).
The dissent [page 1081-82] observes that the majority’s analysis is “contained in three sentences” and that the analysis is not “a reasoned analysis; it is patently ipse dixit.” These comments appear to be made without acknowledgment of the analysis in the majority opinion pages 1074-78 showing why Tijani was convicted of crimes of fraud. The dissent does not note that the first step specified in MarmolejoCampos is for us to establish the elements of the offense. Our interpretation of Marmolejo is no canard, i.e. “a false or fabricated report.” Our interpretation simply repeats what the en banc court said.
Intent to repay is not recognized as a defense by any California case we have been able to find or by California Model Jury Instructions for crimes charged under Penal Code § 532a. They read:
To prove that the defendant is guilty of this crime, the People must prove that: ... The defendant (made the statement/[or] caused the statement to be made) to obtain the (delivery of personal property!,]/[or] payment of cash[,]/[or] making of a loan[,]/[or] extension of credit!,Mor] execution of a contract of guaranty or suretyship!,]/[or] discount of an account receivable!,]/[or] making, acceptance, discount, sale, or endorsement of a bill of exchange or promissory note) for ((his/her) benefit/the benefit of the (other person/corporation)).
Judicial Council of Cal. Crim. Jury Instructions No. 2020 (emphasis added).
Nowhere is there an instruction stating that an intent to repay is a defense.
Relief. Tijani has a fallback: he seeks asylum, withholding of deportation, or CAT relief. There are reasons, set out *1080 strongly by Judge Callahan, for doubting Tijani’s credibility in making these claims. Compelled by precedent, we nonetheless accept his story. The immigration judge found that “the weight of his words is not sufficient to carry his burden of proving eligibility for asylum.” But the immigration judge explicitly refused to find Tijani not credible. Precedent holds that an adverse credibility finding does not require the recitation of a particular formula, yet the finding must be “explicit.” Mansour v. Ashcroft, 390 F.3d 667, 671-72 (9th Cir. 2004). Absent such explicit finding, an immigration judge cannot require corroboration evidence. Kataria v. INS, 232 F.3d 1107, 1113 (9th Cir.2000).
The Real ID Act of 2005 has remedied part of the problem created by our precedent. It permits an immigration judge to ask for corroboration of otherwise credible testimony. 8 U.S.C. § 1158(b)(l)(B)(ii). The proceedings in this case began before the effective date of the new law and are therefore not governed by it. Sandoval-Lua v. Gonzales, 499 F.3d 1121, 1132, n. 10 (9th Cir.2007).

Scope of Remand

Accordingly, we must remand to the agency to address the question of whether Tijani is entitled to relief. But Tijani has not preserved all of his claims. Fairly read, we have no doubt that the IJ’s decision denied Tijani asylum as a matter of discretion. Tijani failed to argue before the BIA or in his opening brief before this court that the exercise of discretion was error. We lack jurisdiction to review legal claims not presented in an alien’s administrative proceedings before the BIA. Barron v. Ashcroft, 358 F.3d 674, 678 (9th Cir.2004). Moreover, we generally will not take up arguments not raised in an alien’s opening brief before this court. Cerezo v. Mukasey, 512 F.8d 1163, 1165 n. 5 (9th Cir.2008). Because both bars apply here, we do not review the IJ’s discretionary denial of asylum to Tijani and so the IJ’s and the BIA’s denial of asylum stands.
We remand to the BIA for consideration of Tijani’s other claims for withholding of deportation and CAT relief.
AFFIRMED in part, REVERSED in part, and REMANDED. Each party shall bear its own costs.

. Tijani argues that the BIA violated his due process rights by (1) denying his motion to transfer venue and (2) using the streamlined procedure to affirm the immigration judge’s decision. Neither claim has merit. This court has held that streamlining does not violate an alien’s due process rights. Falcon Carriche v. Ashcroft, 350 F.3d 845, 848 (9th Cir.2003). As to the motion to transfer venue, Tijani has not established that the proceedings were so "fundamentally unfair” that he was, in effect, "prevented from reasonably representing his case.” See Colmenar v. INS, 210 F.3d 967, 971 (9th Cir.2000).

. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 9, opened for signature Dec. 10, 1984, 231465 U.N.T.S. 85.