**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MONSURU OLASUMBO TIJANI,
                    *Petitioner,*

v.

ERIC H. HOLDER JR.,* Attorney
General,
                    *Respondent.*

No. 05-70195

Agency No.
A27-431-266

ORDER AND
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued November 20, 2007
Submitted February 10, 2008
San Francisco, California

Filed December 6, 2010

Before: John T. Noonan, A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Noonan;
Partial Concurrence and Partial Dissent by Judge Tashima;
Partial Concurrence and Partial Dissent by Judge Callahan

---

*Eric H. Holder, Jr., is substituted for his predecessor, Michael B. Mukasey, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

## COUNSEL

Cecillia D. Wang, San Francisco, California, for the petitioner.

Ada E. Bosque, Washington, D.C., for the respondent.

## ORDER

The Opinion filed March 11, 2010 is withdrawn. A new Opinion is filed herewith.

With the new Opinion, the government's petition for panel rehearing is DENIED. Judge Callahan would grant the government's petition for rehearing.

The panel votes to deny Tijani's petition for panel rehearing. Judge Callahan votes to deny the petition for rehearing en banc and Judge Noonan so recommends. Judge Tashima recommends granting the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote whether to rehear the matter en banc. Fed. R. App. P. 35.

Tijani's petition for rehearing is DENIED and his petition for rehearing en banc is DENIED.

No further petitions for rehearing and for rehearing en banc will be entertained.

---

**OPINION**

NOONAN, Circuit Judge:

Monsuru Olasumbo Tijani, a native and citizen of Nigeria, petitions for a review of a decision of the Board of Immigration Appeals (the BIA), affirming a decision by an immigration judge ordering his removal and denying him asylum. Central to the case is the place of credit in our economy. To the unsophisticated and sometimes to the sophisticate, the nature of credit is a mystery. It is not animal, mineral or vegetable. It is not real property. It is not a chattel. It is not money. Yet it is not a vapor. The one who uses it becomes a debtor, but becomes a debtor empowered to acquire wealth. The one who grants it, the creditor, puts his own wealth at risk.

Credit comes into existence through confidence — confidence that one human being may rely on the representations of another human being. On this utterly unmechanical, uniquely human understanding, a credit economy is formed and wealth is created. To exploit, pervert and destroy the confidence that creates credit is a vicious act. The abuse of the distinctively human capacities to reason and to engage in rational speech, using these capacities to harm another human, may well be considered an act of moral turpitude.

That, at least, is the conclusion most people in this country would reach once they knew the facts. Credit is today the most widespread means of acquiring wealth in this country. To suppose that it is not fraud to try to tap into this wealth by lies is to ignore the economic elements of the modern world. Credit card fraud not fraud? No, in the modern United States it is the paradigm of fraud.

## FACTS

Tijani was born in Lagos, Nigeria on October 19, 1965. He entered the United States in 1982 on a student visa. He adjusted his status to lawful permanent resident in 1985. He was a student at California State University at Sacramento from 1982 to 1985 and has held several jobs in information technology and in biomedical laboratories. He is now married to a citizen of the United States.

In 1986, the year after he achieved the status of lawful permanent resident, Tijani was convicted of perjury in violation of Cal. Penal Code § 118 and of grand theft in violation of Cal. Penal Code § 487; he was sentenced to three years probation. The next year, 1987, he was convicted of passing fraudulent checks in violation of Cal. Penal Code § 476a(a) and sentenced to one and one third years imprisonment.

As a result of these felony convictions, the Immigration and Naturalization Services (now the Department of Homeland Security (DHS)) placed Tijani in deportation proceedings. He applied for a waiver of inadmissibility, submitting a letter on the letterhead of the Brotherhood of the Cross and Star, with its world headquarters indicated as Calabas, Nigeria, and its local headquarters indicated as Los Angeles. The letter was signed by "Pastor O. J. Omogi" and stated that Tijani had been a practicing member of this Christian church for two years. In 1989, an immigration judge granted the waiver.

Two years later, in 1991, Tijani was convicted of violating Cal. Penal Code § 532a(1) by providing false information to

obtain credit cards and using the cards to obtain goods; he was sentenced to prison for one and one-third years. One month later, on January 3, 1992, he was again convicted of filing false statements and had his prison sentence doubled.

On June 9, 1999, Tijani was convicted of twelve counts under the same section of the criminal law which he had been found in 1991 and 1992 to have violated; the crimes this time had been committed between June 1996 and July 1998. This time he was sentenced to prison for nine years and ordered to pay $27,793.71 in restitution.

## PROCEEDINGS

In 2003, Tijani was charged with being removable as an alien convicted of an aggravated felony and two crimes of moral turpitude under 8 U.S.C. § 1227(a)(2)(A)(ii) and (iii), respectively. He applied for asylum, withholding of deportation, and other relief. He testified that, brought up a Muslim, he had become a Christian in 1994 and that, on returning to his mother's village in 1995, to her consternation he revealed his change of religion. She told neighbors, who told the Sharia police, who paid him a visit at her house and reproached him for his apostasy from Islam. He was struck on the head, a blow requiring seventeen stitches to repair and leaving a scar. He was summoned to explain his apostasy in court, but fled Nigeria three days after the incident.

Prior to his removal hearing before the immigration judge in El Centro, California, Tijani filed a pro se motion for change of venue of the removal proceeding to San Francisco. The immigration judge denied his request.[1]

---

[1]Tijani argues that the BIA violated his due process rights by (1) denying his motion to transfer venue and (2) using the streamlined procedure to affirm the immigration judge's decision. Neither claim has merit. This court has held that streamlining does not violate an alien's due process rights. *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 848 (9th Cir. 2003). As to the motion to transfer venue, Tijani has not established that the proceedings were so "fundamentally unfair" that he was, in effect, "prevented from reasonably representing his case." *See Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000).

The immigration judge found the charges against Tijani true, rendering him removable. He found that the 1991 and 1999 convictions were crimes of moral turpitude and that the 1999 conviction was an aggravated felony. The immigration judge further found Tijani's credit card frauds to be particularly serious crimes, hurtful to the credit structure on which the economy of the United States exists. The immigration judge ruled that considering the multiple lies to which his convictions witnessed and also the conflict between his story of his change of religion and the account given in Pastor Omogi's letter, the immigration judge had "reason not to believe him." The immigration judge did explicitly refuse to rule that Tijani was not credible, reasoning that he could "not find an inconsistency in [Tijani's] testimony . . . to say that he [was] not credible." At the same time, the immigration judge found "his words deserve no weight," and described him as the Boy Who Cried Wolf. The judge concluded that Tijani had failed to prove eligibility for asylum, withholding of removal, or relief under the Convention Against Torture ("CAT").[2] The judge also held that if Tijani was eligible for asylum, asylum was denied as a matter of discretion.

The BIA, using its streamlined procedure, affirmed the immigration judge's decision without opinion. Tijani petitions for review.

## JURISDICTION

We have jurisdiction to review the questions of law presented by Tijani's petition. *Fernandez-Ruiz v. Gonzales*, 410 F.3d 585, 586-87 (9th Cir. 2005), *as adopted by Fernandez-Ruiz v. Gonzales,* 466 F.3d 1121, 1124 (9th Cir. 2006) (en banc). Among these questions are whether Tijani has been convicted of crimes of moral turpitude and whether he was required to corroborate his own testimony.

---

[2]Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 9, *opened for signature* Dec. 10, 1984, 231465 U.N.T.S. 85.

## ANALYSIS

On this appeal, we must decide, first, whether the crimes of Tijani, a lawful permanent resident, made him removable. Second, we must decide whether, if removable, he has established his claim for relief.

*The Crimes*. Tijani's string of crimes consisted in credit card fraud in violation of Cal. Penal Code § 532a(1) — a modern form of swindle particularly tempting because of the ease and the impersonality with which the crime may be carried out. Do they constitute removable offenses? The government argues that the BIA correctly affirmed the IJ's decision holding that Tijani's 1991 and 1999 convictions are crimes involving moral turpitude. It also argues that the 1999 conviction is an aggravated felony.

**[1]** To determine whether a conviction constitutes a removable offense, this court applies the approach set out in *Taylor v. United States*, 495 U.S. 575 (1990); *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007). Counterfactual and counterintuitive though it often appears to be, we do not consider the particular facts of the convictions. We first ask whether the "full range of conduct" proscribed by Cal. Penal Code § 532a(1) meets the definition of a crime involving moral turpitude or an aggravated felony. *Nicanor-Romero v. Mukasey*, 523 F.3d 992, 999 (9th Cir. 2008) ("The issue is not whether the actual conduct constitutes a crime involving moral turpitude, but rather, 'whether the *full range of conduct* encompassed by the statute constitutes a crime of moral turpitude' "). If the crime does prohibit conduct that does not necessarily involve moral turpitude, we turn next to the modified categorical approach, under which "We look beyond the language of the statute to a narrow, specified set of documents that are part of the record of conviction, including the indictment, the judgment of conviction, jury instructions, a signed guilty plea, or the transcript from the plea proceedings." *Id.* at 1007 (citation omitted).

Section 532a(1) provides:

> Any person who shall knowingly make or cause to be made, either directly or indirectly or through any agency whatsoever, any false statement in writing, with intent that it shall be relied upon, respecting the financial condition, or means or ability to pay, of himself, or any other person, firm or corporation, in whom he is interested, or for whom he is acting, for the purpose of procuring in any form whatsoever, either the delivery of personal property, the payment of cash, the making of a loan or credit, the extension of a credit, the execution of a contract of guaranty or suretyship, the discount of an account receivable, or the making, acceptance, discount, sale or indorsement of a bill of exchange, or promissory note, for the benefit of either himself or such person, firm or corporation shall be guilty of a public offense.

**[2]** Tijani has argued that his convictions do not constitute crimes involving moral turpitude. His argument appears foreclosed by the frauds of which he stands convicted. The law is that "to be inherently fraudulent, a crime must involve knowingly false representation to gain something of value." *Navarro-Lopez v. Gonzales*, 503 F.3d 1063, 1076 (9th Cir. 2007) (en banc).

**[3]** When this standard is applied, any conviction under the California statute involves fraud; that is, the crime is committed by making a false statement with the intent that it be relied upon to obtain "the delivery of personal property, the payment of cash, the making of a loan or credit . . . ." Cal. Penal Code § 532a(1). Fraud is implicit in the nature of a crime under section 532a(1). The statute of conviction does not explicitly list intent to defraud as an element. But we have held that "[e]ven if intent to defraud is not explicit in the statutory definition, a crime nevertheless may involve moral turpitude if such intent is implicit in the nature of the crime." *Carty v. Ashcroft*,

395 F.3d 1081, 1084 (9th Cir. 2005). A crime under § 532a(1) is committed only when a person by a knowing falsehood obtains property, money, or credit. The fraudster intentionally seeks and obtains something of value by means of his misrepresentation. *See Tall v. Muskasey*, 517 F.3d 1115, 1119 (9th Cir. 2008).

Our dissenting colleague makes this argument as to the elements of the California crime*:*

> As the BIA recognized in *In re Kinney*: "The intent that the false statement be relied upon is not necessarily an intent to do evil or work fraud because . . . one who intends that there be reliance upon his false statement may nevertheless also intend to pay for the goods he is attempting to obtain." 10 I. & N. Dec. at 549 (citations omitted).

The same benevolent interpretation could be extended to a borrower misrepresenting his credit-worthiness to a bank to get a loan: "I'll get rich and pay it all back, the bank will benefit by my chicanery." No court would accept such a defense. The intent of the fraudster is evil: to get what he has no right to get. The California Court of Appeal has rejected this same defense in analyzing California's law of false pretenses, which does explicitly require an intent to defraud:

> [T]he fraudulent intent contemplated by the statute is the intent by the use of false representations to induce another to part with his property when otherwise he would not have done so . . . therefore, when the property is obtained under such circumstances, neither the promise to repay, the intention at the time to make the aggrieved party whole, nor repayment, will relieve the false and fraudulent act in obtaining the property of its criminality.

*People v. Hand*, 16 P.2d 156, 158 (Cal. Ct. App. 1932), *citing People v. Wieger*, 100 Cal. 352 (1893) and *People v. Bowman*, 142 P. 495 (Cal. Ct. App. 1914).

Even if we were to accept the dissent's argument, it would be inapplicable in Tijani's case under the modified categorical approach. The mistaken argument is that Tijani's conviction did not necessarily require an intent to defraud. The information filed in Tijani's 1999 case shows that he was charged specifically with making false statements to procure "the extension of credit," not goods or cash. Two assumptions are concealed in dissent's argument where it is applied to a credit-seeker: (1) that the lying credit-seeker has not obtained something of value when he gets credit and (2) that the lying credit-seeker harbors no evil intent to deprive the creditor of anything. Each assumption is fallacious.

Creditors, like investors, transact in risk. An investor who, as a result of a person's misrepresentations, receives a riskier asset than he bargained for, has suffered measurable and foreseeable economic harm, and is the victim of fraud. Similarly, the creditor who is induced through misrepresentations to give credit suffers measurable and foreseeable harm the moment the creditor enters into the transaction with the fraudster.

The harm is inflicted regardless of whether the customer intends to make timely payments or whether or not he eventually makes them. The creditor's contract with the customer has more than one parameter. Creditors extend a particular line of credit, including a specific credit limit, a specific interest rate, and particular provisions for late fees and penalties, based on the calculated credit-worthiness of a specific customer. A credit-seeker who misrepresents his credit-worthiness does so precisely with the intent of receiving a higher credit limit, a lower interest rate, lower monthly payments, and more favorable late-fee and penalty provisions than he otherwise would — *at the expense of the creditor*. The creditor, in this situation, receives a riskier and less valuable

investment than that bargained for, and therefore suffers measurable and foreseeable economic harm. He has been defrauded.

The current economic crisis highlights the full impact of the misrepresentation of risk in the credit market. The impact is on creditors, consumers, and on the economy. When creditors take on too many risky contracts, whether due to their own carelessness or the misrepresentations of their customers, they are likely to suffer enormous economic harm, and the resulting effects on society can be devastating. Any assessment of the pecuniary harm suffered by the creditor of a fraudster will be incomplete if it is divorced from these economic realities.

**[4]** In a word, to induce a creditor into a risky contract through misrepresentation, on terms to which the creditor would not have agreed if he had not been duped, is to commit fraud on the creditor. Precisely this type of conduct is prohibited under § 532a(1). Tijani's conduct was "inherently fraudulent."

Further fraud is committed when the fraudster uses his fraudulently-obtained credit card to obtain goods. The seller of the goods is now the victim. The seller parts with property in return for a representation of credit to which the fraudster has no right. The harm is tangible and immediate.

**[5]** The argument might be advanced that fraudulently using the card to obtain goods is not fraud on the merchant because he will be paid by the issuer of the card. But at the moment the merchant delivers the goods, he has parted with property on the basis of a lie: that is the fraud. That the merchant will be reimbursed is no more relevant than is insurance to the victim of a theft; the reimbursement does not mean that the victim was not deprived of his property. What is secured by the fraudster is the property he purchases. To argue that it is not fraud to obtain property by falsehood if one harbors the

intent to pay for it at some future time is to suppose that any prosecution for fraud could be defeated by the swindler saying "I intended to pay all along and will now do so." We held in a federal case involving fraud: "While an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all." *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986).

When argument suggests that an intent to repay is a defense to a charge of fraud, it confuses a practical possibility with a legal defense. Of course if the fraudster does in fact pay his bills, he is probably not going to be prosecuted. Who would turn him in? His upright intent to repay does not absolve him of the lie by which he obtained what was not his. It is contended that the creditor could benefit from the fraud when the honest fraudster paid up. But no sane giver of credit would want to be lied to and be persuaded to make credit available or to deliver his goods on the basis of the lie. Any benefit that came from the fraudster turning honest would be a matter of chance.

It is argued that our reading of § 532a(1) makes another section of the same statute, 532(a), redundant. This section criminalizes the act of one who "knowingly or designedly, by any false or fraudulent representation or pretense, defrauds any other person of money, labor, or property, whether real or personal . . . and thereby fraudulently gets possession of money or property, or obtains the labor or service of another . . . ." Cal. Penal Code § 532(a). This statute does not specify fraud in obtaining credit. Therefore, § 532(a) is not otiose. It criminalizes only fraud to obtain labor, money or property. Section 532a(1) aims at fraud in obtaining credit.

Tijani cites *People v. Hagedorn*, 127 Cal. App. 4th 734 (Cal. Ct. App. 2005), applying Cal. Penal Code § 530.5(a) which criminalizes the use of another person's identity "for any unlawful purpose, including to obtain, or attempt to

obtain, credit, goods, services, real property, or medical information . . . ." For conviction under the statute, the court held an intent to defraud was not necessary. *Id.* at 742. But this case merely shows that identity theft is a crime that may not involve fraud. The statute criminalizes identity theft for "any unlawful purpose."

*Barry v. Am. Express Publ'g, Inc.,* 54 Cal. Rptr. 3d 91, 94 (Ct. App. 2007) is worth comment. The question in this civil suit was whether a credit card was covered by the Consumer Legal Remedies Act (CLRA), Cal. Civil Code § 1750 *et seq.* The court held that the card fell neither within the definition of goods nor services, the two types of property protected by the CLRA. The court further noted that the legislature had dropped "money" and "credit" from what the CLRA protected. *Barry* does not show that credit is valueless in California; rather, the case establishes that credit is a distinct kind of valuable.

Tijani calls our attention to *Hirsch v. INS*, 308 F.2d 562 (9th Cir. 1962), which distinguished a fraudulent statement from a false one. The distinction is that a false statement could be made without the intent to induce reliance. The distinction does not help Tijani. Section 532a(1) prohibits only false statements made in the expectation that credit or property will be given in reliance on them. Tijani's false statements were made for that purpose.

*Marmolejo-Campos*. Finally, we disagree with Judge Tashima's assertion that our recent decision in *Marmolejo-Campos v. Holder*, 558 F.3d 903 (9th Cir. 2009) (en banc) requires that we direct the BIA to adhere to its decision in *In re Kinney*, 10 I & N Dec. 548 (1964). Our decision in *Marmolejo-Campos* is inapposite to this petition and the contrary suggestion opens the door to considerable mischief. *Marmolejo-Campos* concerned the deference this court should give a BIA opinion when reviewing a challenge to a BIA decision. We clarified that, pursuant to *Chevron U.S.A. Inc. v.*

*Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), "where
. . . the board determines that certain conduct is morally turpi-
tudinous in a precedential decision, we apply *Chevron* defer-
ence." 558 F.3d at 911. We concluded that "once the elements
of the petitioner's offense are established, our review of the
BIA's determination that such offense constitutes a 'crime of
moral turpitude' is governed by the same traditional principles
of administrative deference we apply to the Board's interpre-
tation of other ambiguous terms in the INA." *Id*.

The first step is that "the elements of the petitioner's
offense be established." To establish the elements is to con-
strue the statute of conviction. As we said:

> [1] The first inquiry requires the BIA to construe
> a state criminal statute. As the BIA has no statutory
> expertise in such state law matters, we review *de
> novo* its determination of the elements of the offense
> for which the petitioner was convicted. [2] The sec-
> ond inquiry requires the BIA to construe the INA by
> defining a particular removable offense and applying
> that definition to a petitioner's state conviction. If, in
> resolving the second issue, the BIA has interpreted
> an ambiguous INA statutory term, and rendered its
> interpretation in a precedential decision intended to
> carry the force of law, we defer under *Chevron
> U.S.A [ ]*, to the BIA's definition so long as it is rea-
> sonable.

*See Fregozo v. Holder*, 576 F.3d 1030, 1034-35 (9th Cir.
2009) (citing *Marmolejo-Campos*) (citations and internal quo-
tations omitted).

As the *Marmolejo-Campos* court explained:

> It is well established that we give no deference to
> the BIA's answer to the first question. The BIA has
> no special expertise by virtue of its statutory respon-

sibilities in construing state or federal criminal stat-
utes and, thus, has no special administrative
competence to interpret the petitioner's statute of
conviction. As a consequence, we review the BIA's
finding regarding the specific act for which the peti-
tioner was convicted *de novo*.

*Marmolejo-Campos v. Holder*, 558 F.3d 903, 907 (9th Cir.
2009)

Deference is not due the agency in construing state law. We
determine that an element of the California statute is fraud.
Once that is determined, the conclusion is clear: "Crimes
involving fraud are considered to be crimes involving moral
turpitude." *See Matter of Correa-Garcia*, 20 I. & N. Dec. 451,
453 (BIA 1992).

The erroneous exposition of the elements of the crime in
*Kinney* is not binding upon us. *Kinney* contains the proposi-
tion that credit card fraud is not fraud because the fraudster
might harbor the intent to repay the credit he fraudulently
requires. That proposition, as our preceding analysis has dem-
onstrated, is contrary to the law. Moral turpitude attaches to
the fraud. "Without exception, federal and state courts have
held that a crime in which fraud is an ingredient involves
moral turpitude." *Jordan v. De George*, 341 U.S. 223, 227
(1951).

The dissent [page 19394] observes that the majority's anal-
ysis is "contained in three sentences" and that the analysis is
not "a reasoned analysis; it is patently *ipse dixit.*" These com-
ments appear to be made without acknowledgment of the
analysis in the majority opinion pages 19380-87 showing why
Tijani was convicted of crimes of fraud. The dissent does not
note that the first step specified in *Marmolejo-Compos* is for
us to establish the elements of the offense. Our interpretation
of *Marmolejo* is no canard, i.e. "a false or fabricated report."
Our interpretation simply repeats what the en banc court said.

Intent to repay is not recognized as a defense by any California case we have been able to find or by California Model Jury Instructions for crimes charged under Penal Code § 532a. They read:

> To prove that the defendant is guilty of this crime, the People must prove that: . . . The defendant (made the statement/[or] caused the statement to be made) to obtain the (delivery of personal property[,]/[or] payment of cash[,]/[or] **making of a loan[,]/[or] extension of credit**[,]/[or] execution of a contract of guaranty or suretyship[,]/[or] discount of an account receivable[,]/[or] making, acceptance, discount, sale, or endorsement of a bill of exchange or promissory note) for ((his/her) benefit/the benefit of the (other person/corporation)).

Judicial Council of Cal. Crim. Jury Instructions No. 2020 (emphasis added).

Nowhere is there an instruction stating that an intent to repay is a defense.

**[6]** *Relief.* Tijani has a fallback: he seeks asylum, withholding of deportation, or CAT relief. There are reasons, set out strongly by Judge Callahan, for doubting Tijani's credibility in making these claims. Compelled by precedent, we nonetheless accept his story. The immigration judge found that "the weight of his words is not sufficient to carry his burden of proving eligibility for asylum." But the immigration judge explicitly refused to find Tijani not credible. Precedent holds that an adverse credibility finding does not require the recitation of a particular formula, yet the finding must be "explicit." *Mansour v. Aschcroft*, 390 F.3d 667, 671-72 (9th Cir. 2004). Absent such explicit finding, an immigration judge cannot require corroboration evidence. *Kataria v. INS*, 232 F.3d 1107, 1113 (9th Cir. 2000).

The Real ID Act of 2005 has remedied part of the problem created by our precedent. It permits an immigration judge to ask for corroboration of otherwise credible testimony. 8 U.S.C. § 1158(b)(1)(B)(ii). The proceedings in this case began before the effective date of the new law and are therefore not governed by it. *Sandoval-Lua v. Gonzalez*, 499 F.3d 1121, 1132, n.10 (9th Cir. 2007).

*Scope of Remand*

**[7]** Accordingly, we must remand to the agency to address the question of whether Tijani is entitled to relief. But Tijani has not preserved all of his claims. Fairly read, we have no doubt that the IJ's decision denied Tijani asylum as a matter of discretion. Tijani failed to argue before the BIA or in his opening brief before this court that the exercise of discretion was error. We lack jurisdiction to review legal claims not presented in an alien's administrative proceedings before the BIA. *Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004). Moreover, we generally will not take up arguments not raised in an alien's opening brief before this court. *Perezo v. Mukasey*, 512 F.3d 1163, 1165 n.5 (9th Cir. 2008). Because both bars apply here, we do not review the IJ's discretionary denial of asylum to Tijani and so the IJ's and the BIA's denial of asylum stands.

We remand to the BIA for consideration of Tijani's other claims for withholding of deportation and CAT relief.

AFFIRMED in part, REVERSED in part, and REMANDED. Each party shall bear its own costs.

TASHIMA, Circuit Judge, concurring in part and dissenting in part:

Because the majority employs an unauthorized non-categorical mode of analysis in concluding that the petitioner was convicted of a crime involving moral turpitude ("CIMT"), I respectfully dissent from the majority opinion, except for the section entitled *Relief*, commencing at Maj. op. 19390.

In open defiance of our recent en banc holding in *Marmolejo-Campos v. Holder*, 558 F.3d 903, 911 (9th Cir. 2009) (en banc), that the determination of whether a crime is a CIMT is committed to the Board of Immigration Appeals ("BIA"), the majority refuses to grant the BIA's published, precedential decision that the crime involved here is not a CIMT the deference to which it is entitled and, instead, makes its own free-wheeling determination that the crime involved is a CIMT. It not only ignores the BIA's precedential decision, but fails to adhere to the categorical-approach analysis of *Taylor v. United States*, 495 U.S. 575 (1990). It ignores the accepted elements of the offense, concocts its own version of what offenses the crime categorically includes, and pays no attention to the state courts' interpretation of the elements that constitute the crime.

Granting the BIA's decision the deference that it is owed, and requiring the BIA in a one-member, "streamlined" disposition to follow its own binding precedent, I would hold that petitioner Monsuru Olasumbo Tijani is not removable and grant the petition for review.

The pivotal issue in this case is whether a violation of Cal. Penal Code § 532a(1) is a CIMT. We recently held, en banc, that the BIA's precedential decision determining that a crime is or is not a CIMT is entitled to *Chevron*[1] deference. *See*

---

[1] *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

*Marmolejo-Campos*, 558 F.3d at 910-11. We there held that the BIA's precedential determination of whether an offense meets the INA's definition of moral turpitude "is precisely the type of agency action the Supreme Court instructs is entitled to *Chevron* deference." *Id.* at 910 (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)).

The crime at issue here, entitled "False financial statements," provides in relevant part:

> Any person who shall knowingly make or cause to be made, either directly or indirectly or through any agency whatsoever, any false statement in writing, with intent that it shall be relied upon, respecting the financial condition, or means or ability to pay, of himself . . . for the purpose of procuring in any form whatsoever, either the delivery of personal property, the payment of cash, the making of a loan or credit, the extension of a credit, the execution of a contract of guaranty or suretyship, the discount of an account receivable, or the making, acceptance, discount, sale or indorsement of a bill of exchange, or promissory note, for the benefit of [ ] himself . . . shall be guilty of a public offense.

Cal. Penal Code § 532a(1).[2] In *In re Kinney*, 10 I. & N. Dec. 548 (BIA 1964), a published, precedential opinion, in construing a Connecticut statute that is identical to § 532a(1),[3] the

---

[2]The majority mislabels this offense as "credit card fraud," which it is not. The California Penal Code entitles the section "False financial statements." Thus, by mislabeling the offense, the majority prejudges the issue of whether it is a CIMT, because all fraud offenses are CIMTs. *See Jordan v. DeGeorge*, 341 U.S. 223, 232 (1951) ("The phrase 'crime involving moral turpitude' has without exception been construed to embrace fraudulent conduct."). But, as I explain below, fraud or a fraudulent intent is not an element of this offense.

[3]Although the majority asserts that *In re Kinney* contains an "erroneous exposition of the elements of the crime," Maj. op. at 19389, it does not

BIA held that procuring credit by way of a false statement is *not* morally turpitudinous. That should be the end of our inquiry.

But in its perplexing interpretation of *Chevron* deference, the majority collapses the CIMT determination into the *Taylor* analysis of the elements of the offense. The majority's entire "analysis" is contained in three sentences:

> Deference is not due the agency in construing state law. We determine that an element of the California statute is fraud. Once that is determined the conclusion is clear: "Crimes involving fraud are considered to be crimes involving moral turpitude." *See Matter of Correa-Garcia*, 20 I. & N. Dec. 451, 453 (BIA 1992). ¶ The erroneous exposition of the elements of the crime in *Kinney* is not binding upon us.

Maj. op. at 19389. But this interpretation of the statute is not a reasoned analysis; it is patently *ipse dixit*. Moreover, it is the majority's "exposition of the elements of the crime" that is erroneous. It is also inconsistent with a *Taylor* categorical inquiry because fraudulent intent is *not* an element of the crime. Under California's standard jury instructions, the *only*

---

contest that the elements of the Connecticut statute at issue in *In re Kinney* are identical to the elements of Cal. Penal Code § 532a(1). The statute at issue in *In re Kinney* provided:

> Any person who knowingly makes or causes to be made, either directly or indirectly or through any agency, any false statement in writing, with intent that it shall be relied upon, concerning the financial condition or means or ability to pay of himself . . . for the purpose of procuring . . . the delivery of personal property, the payment of cash, the making of a loan or credit, the extension of credit . . . shall be fined two thousand dollars or imprisoned not more than five years or both.

*In re Kinney*, 10 I. & N. Dec. at 548-49 (quoting Conn. Gen. Stat. § 8698 (1949 Revision)). A comparison of the two statutes quickly reveals that they are, for all relevant purposes, identical.

intent required for a conviction under § 532a(1) is that the defendant "intended that the statement be relied on." CAL-CRIM 2020, 2 Judicial Council of Cal., Criminal Jury Instructions (2009).[4] When the crime at issue requires an intent to defraud, as in forgery, the Cal. Judicial Council Criminal Jury Instructions clearly require a fraud instruction, *i.e.*, that "[s]omeone *intends to defraud* if he or she intends to deceive another person either to cause a loss of something of value, or cause damage to, a legal, financial, or property right." CALCRIM 1901. Thus, the majority's conclusory statement that "[w]e determine that an element of the California statute is fraud," is clearly contrary to California's construction of its own law and is unsupported by any California case or standard jury instruction. It does not conform to *Taylor*'s categorical approach. The majority simply refuses to accept the elements of the offense as defined by California law.

As the BIA recognized in *In re Kinney*: "The intent that the false statement be relied upon is not necessarily an intent to do evil or work fraud because . . . one who intends that there be reliance upon his false statement may nevertheless also intend to pay for the goods he is attempting to obtain." 10 I. & N. Dec. at 549 (citations omitted). The majority labels this as a "benevolent interpretation" and asserts that "[n]o court would accept such a defense." Maj. op. at 19383. But it is exactly the "defense" that is accepted by the California courts in California's standard jury instructions; moreover, it is also exactly how the BIA, pursuant to its discretion recognized by *Marmolejo-Campos*, interprets the statute.

Rather than making the categorical inquiry mandated by *Taylor*, the majority constructs an elaborate apologia of Wall Street and the banking industry and engages in speculation on

---

[4]Note that, while the majority also relies on and quotes this same standard instruction, CALCRIM 2020, *see* Maj. op. at 19390, it carefully avoids mention of the *mens rea* element of the crime quoted above, which is *not* an intent to defraud.

the causes of the "current economic crisis." Maj. op. at 19385. These ruminations, however, have nothing to do with the question at hand and do not move us forward in the task with which we are charged: To examine the statute and to determine whether that statute, as construed by the California courts, is categorically a CIMT.[5]

The majority's subjective, non-categorical approach to interpreting the statute begins with its characterization of the crime as "a modern form of swindle," Maj. op. at 19381, implying that the statute was recently enacted to combat credit card fraud "in the modern United States," Maj. op. at 19378, ignoring that the statute was enacted in 1913. *See* 1913 Cal. Stat. c. 251, p. 437, § 1. It then concludes by stating that "[t]he erroneous exposition of the elements of the crime in *Kinney* is not binding upon us." Maj. op. at 19389. But the majority simply misreads *In re Kinney. In re Kinney* accepts the crime as defined by state law. What it concludes is that the intent required by the statute does not amount to fraud. After agreeing with government counsel that the statute, like the California statute, "requires the false statement to be made with intent that it be relied upon," the BIA goes on to observe:

> The intent to which moral turpitude adheres, is the intent to do evil or work fraud—this intent is absent in section 8698. The intent that the false statement be relied upon is not necessarily an intent to do evil or work fraud because as the special inquiry officer has pointed out, one who intends that there be reliance upon his false statement may nevertheless also

---

[5]The majority complains that my characterization of its "determination" that "an element of the California statute is fraud" "is patently *ipse dixit*" does not "acknowledge[ ] the analysis in the majority opinion pages 19380-87 showing why Tijani was convicted of crimes of fraud." Maj. op. at 19389. Obviously, however, those subjective ruminations, wholly divorced from the elements of § 532a(1) and unsupported by any citation to directly applicable California authority, are not an objective categorical analysis of the elements of the offense mandated by *Taylor*.

> intend to pay for the goods he is attempting to obtain. The fact that a person convicted under section 8698, intended to commit fraud, does not make a conviction under the section one involving moral turpitude. It is the moral obliquity of the crime and not of the individual that is the test under the law.

*In re Kinney*, 10 I. & N. Dec. at 549.

The majority also insists on labeling a violation of § 532a(1) as "credit card fraud," *e.g.*, Maj. op. at 19378, 19380, 19381, which is not an accurate *categorical* description of the elements of this 97-year-old statute, which was enacted decades before the credit card was invented. Whatever else the majority's fixation on "credit card fraud" as "a modern form of swindle" may be, it decidedly is not the categorical examination of § 532a(1) mandated by *Taylor*.[6]

"The essence of moral turpitude is an evil or malicious intent." *In re Phong Nguyen Tran*, 21 I. & N. Dec. 291, 293 (BIA 1996). Fraud is a crime of moral turpitude because evil intent is inherent in an intent to defraud. *Goldeshtein v. INS*, 8 F.3d 645, 647 (9th Cir. 1993); *compare Hirsch v. INS*, 308 F.2d 562, 567 (9th Cir. 1962) ("A crime that does not necessarily involve evil intent, such as intent to defraud, is not necessarily a crime involving moral turpitude."). The evil intent inherent in an intent to defraud is simply missing where intent to deprive another of property is not an element of the offense. Thus, the crime of procuring credit by the use of a false statement is not categorically fraudulent, as the BIA recognized in *In re Kinney*, because an individual need not have

---

[6]The majority also makes a half-hearted attempt to invoke the modified categorical approach, Maj. op. at 19384, but this attempt is as deficient as its categorical-approach analysis in that it also completely ignores the mens rea element of the offense. Moreover, because intent to defraud is a "missing element," it cannot be supplied by turning to the modified categorical approach. *See Navarro-Lopez v. Gonzales*, 503 F.3d 1063, 1073 (9th Cir. 2007) (en banc).

an evil intent to defraud in making a false statement in violation of the statute, *i.e.*, intent to defraud is *not* an element of the offense.

Additionally, *People v. Hagedorn*, 25 Cal. Rptr. 3d 879 (Ct. App. 2005), evinces the California courts' reluctance to read an intent to defraud into a statute that does not include it on its face. The statute there in question, an identity theft statute, criminalizes the use of personal identifying information belonging to another "for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information." Cal. Penal Code § 530.5(a). The court held that the statute "clearly and unambiguously does *not* require an intent to defraud." *Hagedorn*, 25 Cal. Rptr. 3d at 885. *Hagedorn* clearly illustrates that under the California courts' mode of analysis, a fraud requirement will not be implied into a statute that does not contain a fraud element on its face.[7]

Thus, reading § 532a(1) as not categorically including an intent to defraud is consistent with California law,[8] as well as

---

[7]Moreover, the California Legislature has been explicit that when it intends fraud to be an element of an offense it includes it in the statute. *See, e.g.*, Cal. Penal Code § 470(d) (forgery includes "with intent to defraud" as an element); Cal. Penal Code § 476a(a) (check kiting) (same); Cal. Penal Code § 548(a) (insurance fraud) (same). As the court observed in *Hagedorn*, "Obviously, if the Legislature meant for [the statute in question] to require an intent to defraud, it knew how to so provide." 25 Cal. Rptr. 3d at 885. *People v. Hand*, 16 P.2d 156 (Cal. Ct. App. 1932), cited by the majority, exemplifies the California Legislature's approach. The statute there involved, Cal. Penal Code § 484, unlike § 532a(1), as the majority concedes, "does expressly require an intent to defraud." Maj. op. at 19383.

[8]Although the majority purports to address why Tijani cited *Hagedorn*, noting that "the court held that intent to defraud was not necessary" for a conviction under Cal. Penal Code § 530.5(a), Maj. op. at 19387 (citing *Hagedorn*, 25 Cal. Rptr. 3d at 885), it does not respond to my reason for citing the case — that *Hagedorn*'s mode of analysis demonstrates that California courts do not read an intent to defraud into a statute that does not include such a requirement on its face.

with the BIA's reasonable interpretation to which we must defer. The majority's refusal to grant *Chevron* deference to *In re Kinney* and accept it as binding flies in the face of our recent en banc decision in *Marmolejo-Campos*. Under *Marmolejo-Campos*, we have no authority to ignore *In re Kinney,* as the majority purports to do.

The majority characterizes *Marmolejo-Campos* as "inapposite to this petition," Maj. op. at 19387, but it reaches that conclusion, as explained earlier, only by relying on its off-hand, single-sentence "determination" that "an element of the California statute is fraud." Maj. op. at 19389.

Under our case law, like any other court or agency, the BIA, too, must follow the law. The BIA's own regulations provide:

> Except as Board decisions may be modified or overruled by the Board or the Attorney General, decisions of the Board, and decisions of the Attorney General, shall be binding on all officers and employees of the Department of Homeland Security or immigration judges in the administration of the immigration laws of the United States.

8 C.F.R. § 1003.1(g).

As we explained in *Hernandez v. Ashcroft*, 345 F.3d 824, 846 (9th Cir. 2003), the BIA cannot simply ignore its own long-established precedent. We emphasized that "the regulations themselves limit the BIA's discretion to operating within the law." *Id.* (discussing § 1003.1). Thus, we held, "[a] non-precedential decision by the BIA in defiance of its own precedential case law simply cannot be classified as discretionary." *Id.* In short, the "BIA has no discretion to make a decision that is contrary to law." *Id.*

The decision at issue here was an IJ's decision which was adopted by one member of the BIA. As the majority concedes, Maj. op. at 19380, this was a "streamlined" decision, *i.e.*, a decision by one member in which the BIA agrees with the result but does not endorse the reasoning. *See* 8 C.F.R. § 1003.1(e)(4); *Falcon-Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir. 2003). Thus, the majority's rejection of the controlling force of *Marmolejo-Campos* and, through it, of *In re Kinney*, is without foundation.[9]

Tijani was not convicted of a CIMT. Contrary to the majority's *ipse dixit*, intent to defraud is not an explicit or implicit requirement of § 532a(1). Moreover, the BIA has reasonably determined in a precedential decision that this crime is not morally turpitudinous and, under *Marmolejo-Campos*, we owe deference to the BIA's determination.

Because Tijani has not committed a removable offense, I would hold that he is not removable and grant the petition.

\* \* \* \* \*

Alternatively, I concur in that portion of the majority opin-

---

[9] Judge Callahan, in her concurring and dissenting opinion, offers a further reason for distinguishing *In re Kinney* and *Marmolejo-Campos*. She states that "*Marmolejo-Campos*, like all other cases following *Chevron*, recognizes that an agency may develop its positions through a 'process of case-by-case adjudication.' 558 F.3d at 908. This process inherently allows for differences over a period of forty-five years. The agency decision-making process envisioned by Congress allows for change over time, and nothing in *Chevron* or *Marmolejo-Campos* supports this court insisting that the BIA adhere to a forty-five year old precedent." Callahan concur. and diss. op. at 4095 n.2. The problem with this assertion, although it may be true as a general proposition, is that neither Judge Callahan nor the majority cites or identifies any precedential case of the BIA (or any circuit) in the 45 years since *In re Kinney* was decided that questions *Kinney*. And, of course, the one-member, streamlined adoption of the IJ's decision in this case is not entitled to *Chevron* deference. *See Miranda-Alvarado v. Gonzales*, 449 F.3d 915, 924 (9th Cir. 2006).

ion holding that the IJ erred in requiring corroborating evidence in the absence of an explicit adverse credibility finding. Maj. op. at 19390-91. I would add only that on remand, under the cases cited in the majority opinion, when evaluating Tijani's claims for relief from removal, the IJ must credit Tijani's testimony as true. *See Mansour v. Ashcroft*, 390 F.3d 667, 672 (9th Cir. 2004) ("In the absence of an explicit adverse credibility finding, we must assume that [Petitioner's] factual contentions are true.") (quoting *Kataria v. INS*, 232 F.3d 1107, 1114 (9th Cir. 2000))).

---

CALLAHAN, Circuit Judge, concurring and dissenting:

Nonsuro Olasumbo Tijani, a native and citizen of Nigeria, has been convicted on four separate occasions for crimes of dishonesty and financial fraud: in 1986 for perjury, in 1987 for passing fraudulent checks, in 1991 for providing false information to obtain credit cards in violation of California Penal Code § 532, and in 1999 on twelve counts of again violating § 532(a)(1) by providing false information to obtain credit cards and using the cards to obtain goods. The government, most reasonably, seeks to remove Tijani to Nigeria. I would affirm the decision by the Board of Immigration Appeals ("BIA") to deny Tijani relief.

I agree with Judge Noonan that Tijani was convicted of a crime involving moral turpitude.[1] I also agree, albeit for slightly different reasons than expressed by Judge Noonan, that our opinion in *Marmolejo-Campos v. Holder*, 558 F.3d 903 (9th Cir. 2009) (en banc) does not require that we direct the BIA to adhere to its decision in *In re Kinney*, 10 I & N Dec. 548 (1964).[2]

---

[1]I also agree that neither of Tijani's due process claims have any merit.

[2]Even if *In re Kinney* were not distinguishable as set forth in Judge Noonan's opinion, there are two features of *Marmolejo-Campos* that ren-

However, I do not agree that because the Immigration Judge ("IJ") may not have explicitly stated that Tijani was not credible, Tijani must be presumed to be credible, or that the IJ could not require that Tijani corroborate his unsupported testimony. At the very least, my colleagues needlessly prolong Tijani's removal proceedings. The greater harm, however, lies in their reliance on technicalities to overcome the reality of the situation and to defeat the purpose and letter of our precedents.

Because Judge Noonan and I agree that Tijani is removable, Tijani would only be entitled to relief if he made the requisite showings for asylum, withholding of removal, or protection against torture. However, Tijani's eligibility for these forms of relief depends on his credibility. I read the record to show that the IJ held that Tijani was not credible and to contain substantial evidence supporting that determination. Moreover, the IJ properly held that Tijani had not carried his burden to show eligibility for asylum, withholding of removal, or protection against torture because he failed to proffer any evidence to support his incredible testimony.

A.   *The Immigration Judge's Opinion*

The best evidence that the IJ found that Tijani was not credible is the IJ's decision. The IJ wrote:

> The respondent was admitted into the United
> States in 1985. The court finds the situation with the

---

der it inapposite to the case at bar. First, the issue is what deference this court should give to an agency decision, not what deference an agency is required to give to its own precedent. *See United States v. Mead*, 533 U.S. 218, 229 (2001). Second, *Marmolejo-Campos*, like all the other cases following *Chevron*, recognizes that an agency may develop its positions through a "process of case-by-case adjudication." 558 F.3d at 908. This process inherently allows for differences over a period of forty-five years. The agency decision-making process envisioned by Congress allows for change over time, and nothing in *Chevron* or *Marmolejo-Campos* supports this court insisting that the BIA adhere to a forty-five year old precedent.

respondent analogous to that of the boy who cried wolf. In 1986 the respondent was convicted of perjury. Perjury is a crime under Section 118 of the California Penal Code, which is essentially a crime for lying. In 1986 when the respondent in essence cried wolf a Judge in a court found that he did in fact lie and he was convicted and sentence[d] to 36 months probation. At the same time the respondent indicated his willingness to violate law and his lack of character by also being convicted of grand theft. As mentioned above, it is not clear whether the respondent has two perjury convictions or one perjury conviction, two grand theft convictions or one. It is respondent's burden of proof.

In 1987 the respondent was convicted of insufficient funds under Section 476A. This is the second time the respondent cried wolf. Again, a Judge was called upon to determine whether the respondent's statements were true or not. The respondent wrote a check representing that he had funds in an account necessary to cover the expenses. He knowingly did not have the funds and therefore he was sentenced to 16 months in prison. This is the second time a Judge has found the respondent has not told the truth.

In 1989 the respondent was in removal proceedings by the foreign Immigration Judge. The respondent submitted or had submitted on his behalf by his legal representative, who he was friendly enough with to attend church together, a letter to the Judge. The letter to the Judge is from a pastor. The letter represents that the respondent is a Christian and that he provided numerous dedicated services. The letter represents that respondent attended the church for two years. The letter provided the respondent had become a member of that church. The respondent now testifies that this letter that was sent to the Judge

on his behalf is a lie. The respondent represents how that letter was written and he does not recall having seen the letter.

In 1991 the respondent picked up a conviction for filing financial statements. In this case the respondent lied, used a fictitious name, fictitious social security number, fictitious business name and business address and falsely represented himself to be another person. In essence the respondent lied about his own identity. The respondent did so in such a manner that it was relied upon by Sears to extend benefits to him for which he was not entitled. This is the third time the respondent cried wolf. Again, a Judge was called upon and found that the respondent had in fact lied and the cry of wolf was not true. The Judge, as a result, sentenced the respondent to two years, 4 months in prison. 16 months for the lie and 1 year for the prior lies. Exhibit 3 reflects the respondent has another conviction, on January 23, 1992 in Santa Barbara, California for false financial statements. This was found to be the basis to sustain a one year prison enhancement. This is another instance, and in fact the fourth in the United States, where the respondent cried wolf and a Judge was called upon and determined that the respondent had lied again and this time the respondent was given appropriate sanctions.

The respondent is now in front of me on 12 counts of again lying. The respondent was convicted in 1999 on 12 different counts of filing false financial statements. These lies occurred between 1996 and 1998. This is another 12 instances where the respondent cries wolf. And each time the Court and a Judge is required to come in and in each of these 12 instances that were alleged, the Judge found that the

respondent had lied and this time imposed 9 years in prison.

The respondent in front of me has testified in 1994 he was in college and that he decided to convert to Christianity. The respondent acknowledges that the Christian faith has as one of its [tenets, thou] shall not steal. The respondent based upon the record has committed numerous offenses of this section. The Court finds that this, at a minimum draws into question whether the respondent holds this faith. The Court also find[s] the fact that the respondent previously has been in front of an immigration judge and someone on behalf of the respondent has submitted a very detailed letter written directly to the Judge saying the respondent had been a Christian and part of the Christian sect of Brotherhood of the Cross and Star [in] 1999 [sic]. Accordingly take notice, Judge Peters granted the respondent relief on May 12, 1989. The case before Judge Peters began in 1987. The respondent, however, distances himself from this letter saying he does not recall it and that it is not true. If it is not respondent in this case who is not telling the truth, someone is submitting lies to the Judge on his behalf.

Now the respondent is coming before this Court. The respondent is requesting asylum in the United States. Although the respondent or someone in his behalf testified that he became a Christian in 1987 and submitted details regarding his practice and church attendance as well as his character during the two year period of [1987 to 1989] when he was allegedly a member of this Christian sect of Brotherhood of the Cross and Star. Respondent has testified to the contrary today that he did not become a Christian until 1994 when he was in college.

The respondent is claiming that he would be persecuted and tortured upon return to Nigeria because of the fact that he [has] changed his religion. This time the respondent is not crying wolf. Instead on this occasion the respondent is crying an alligator is present. The respondent would like the United States and its Government to run and give him the necessary relief and believe him. The Court, however, finds that after a conviction for perjury, after false statements have been submitted to an Immigration Judge regarding the respondent in the past, the fact that the record contains conflicting evidence as to when the respondent did become [a] Christian, even if [he] did and based upon this case that the Court has reason not to believe the respondent this time. The 9th Circuit Court of Appeals has held that it is not necessary to corroborate one[’s] testimony if it is specific, credible and direct. This Court, however, finds for the reasons set forth above that there are a number of deficiencies in the respondent’s testimony. The Court also finds that when the little boy comes 16 times and cries wolf and each time it is verified beyond a doubt that he is telling a lie, the 17th time that he cries [that] he is afraid of an alligator, that it is reasonable for the trier [of] fact, in this case myself, not to [believe] him. This Court is not going to specifically find for the record that the respondent is not credible because the Court cannot point to a single inconsistency in the record other than the fact that the respondent claims that in 1994 he was a Christian, although it appears that it has been represented to an Immigration Judge before, that occurred in 1987. But the Court finds based upon the respondent’s past lengthy detailed record of lying in this country, which has occurred on [a] continuous and regular basis that the words of this respondent simply deserve no weight. This Court is not, after 16 occasions of crying wolf, going to

believe the respondent at this time when he claims a different harm that necessitating asylum without requiring some type of corroboration. In essence what the Court is saying then is while it cannot find an inconsistency in the respondent's testimony at this time to say that he is not credible, it finds that the weight of his words is not sufficient to carry his burden of proving eligibility for asylum. If the boy comes and claims alligator, this Court cannot say that after 16 prior lies that there is any way to deem the statement there is an alligator to be inconsistent. The Court, however, finds that the weight of those words, there is an alligator after 16 occasions of finding beyond a doubt that there is [a] lie sufficient to say to the boy well if there is an alligator this time, you need to prove it to me and demonstrate that your words are true. The Court simply finds that the respondent has not done so and has failed to meet his burden of proof.

B.  *The IJ adequately explained his determination that Tijani was notcredible*

Even though the IJ's perspective is certainly reasonable, if not compelling, my colleagues read the IJ's decision as insufficiently explicit to be a credibility determination. As authority they cite the statement in *Mansour v. Ashcroft*, 390 F.3d 667, 671 (9th Cir. 2004), that the Ninth Circuit "does not permit implicit adverse credibility determinations."

First, there is nothing implicit about the IJ's determination. He finds that because Tijani has been found by judges to have lied on 16 prior occasions, he is not credible. The IJ concluded that "based upon the respondent's past lengthy detailed record of lying in this country, which has occurred on a continuous and regular basis that the words of this respondent simply deserve no weight." Perhaps if the IJ had said no more, he would have been affirmed. The IJ, however, admit-

ted that on Tijani's seventeenth incredible claim, the only spe-
cific inconsistency he found was Tijani's prior representation
(on which he was granted relief) that he had converted to
Christianity in 1987 or 1988, rather than 1994, as he now
claims. This too should be enough to deny Tijani relief. *See
INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) ("To
reverse the BIA finding we must find that the evidence not
only *supports* that conclusion, but *compels* it.") (emphasis in
original). The majority opinion, however, seems to hold that
because the IJ fails to find a more specific inconsistency in
Tijani's claim of religious persecution in Nigeria, we are
bound by our precedent to accept Tijani's representations as
true. In other words, if an applicant spins a sufficiently clever
yarn for which there is no direct contrary evidence, it must be
accepted as true.[3] I do not read our precedent as compelling
this conclusion.

---

[3]This case presents a similar situation to that to which then Judge, now
Chief Judge, Kozinski dissented in *Kumar v. Gonzales*, 444 F.3d 1043,
1060-61 (9th Cir. 2006) (Kozinski, J., dissenting), where he wrote:

> The larger problem with the majority's opinion is its know-it-all
> approach, an error oft repeated when our circuit reviews immi-
> gration cases in which an IJ has made an adverse credibility
> determination. First, the majority lays out the applicant's story as
> if it were the gospel truth, making it seem like denial of rehearing
> will cause a huge miscarriage of justice. Then the majority picks
> apart the IJ's findings piece by piece, scrutinizing his every sen-
> tence as if it is completely unconnected to the rest of his opinion.
> Don't agree with the IJ that the applicant is lying? Not to worry;
> just label the IJ's finding "speculation and conjecture." . . . Find-
> ing it difficult to dispute that the applicant is lying? No problem;
> just label the inconsistencies "minor," or "merely incidental to
> [the] asylum claim." . . . The net effect is that any asylum appli-
> cant who is a skillful enough liar — and many who aren't —
> must be believed no matter how implausible or farfetched their
> story . . . . It also means that IJs, who are doubtless chary of being
> vilified by august court of appeals judges, become even more
> reluctant to make adverse credibility findings, even when they
> have good reason to believe the asylum applicant is lying.

(footnote and internal citations omitted).

Admittedly, our opinions have not been a model of clarity or consistency. In *Jibril v. Gonzales*, 423 F.3d 1129, 1135 (9th Cir. 2005), we explained:

> Under our case law, testimony that is "implausible *in light of the background evidence*," *Chebchoub v. INS,* 257 F.3d 1038, 1043 (9th Cir. 2001) (emphasis added), can support an adverse credibility finding. For example, a finding made by an IJ that a petitioner's testimony is implausible given the evidence in a Country Report or other objective evidence in the record is accorded deference. However, when an IJ finds a petitioner's testimony implausible based solely on "conjecture and speculation" that the testimony, though uncontroverted by any evidence that the IJ can point to in the record, is inherently unbelievable, then that "finding" should not automatically be accorded deference. *See Vera-Villegas v. INS,* 330 F.3d 1222, 1231 (9th Cir. 2003) ("The IJ's view was based on mere speculation and conjecture, and . . . conjecture is not a substitute for substantial evidence.") (quotation marks omitted).

> Although "speculation and conjecture" alone cannot sustain an adverse credibility finding, an IJ must be allowed to exercise common sense in rejecting a petitioner's testimony even if the IJ cannot point to specific, contrary evidence in the record to refute it. Without such latitude, IJs would be bound to credit even the most outlandish testimony as long as it was internally consistent and not contradicted by independent evidence in the record. Unfortunately, a survey of our precedent reveals no consistent line that has been drawn between an IJ's legitimate application of common sense, on the one hand, and an IJ's reliance on "speculation or conjecture" in determining that a fact alleged by a petitioner is implausible on the other.

It appears that a critical line regarding deference to an IJ's determination that an applicant is not credible is whether the determination is based on "speculation or conjecture" or on compelling background evidence. In *Mansour*, we declined to defer to the IJ's ambiguous adverse credibility determination because it was based on concerns as to inconsistencies in the evidence and questions as to whether the petitioner had provided false information.[4] *Mansour*, 390 F.3d at 671. Similarly, in *Kataria v. INS*, 232 F.3d 1107, 1111-13 (9th Cir. 2000), the IJ did not make an explicit adverse credibility determination, but expressed concerns about mistakes in Kataria's application and inconsistencies in the evidence concerning his religion and where he lived, which he failed to address by submitting supporting evidence.

In the case at bar, the IJ was not concerned so much with inconsistencies in Tijani's actual testimony or mistakes in his application but with the facts that: (1) on numerous prior occasions, Tijani had been judicially determined to have lied and had been criminally convicted for his lies; and (2) Tijani testified that he had not converted to Christianity until 1994 although in 1989, a prior IJ had granted Tijani adjustment of status based on his representation that he had converted to Christianity in 1987. This irrefutable "background" information suggests that no fact-finder should be compelled to accept Tijani's unsupported testimony as true.

C. *The IJ properly denied Tijani relief because he failed to proffer any corrobative evidence*

I do not read our precedent as prohibiting the IJ in this case, where substantial evidence undermined the petitioner's credibility, from requiring that Tijani provide supporting evidence of his claim of religious persecution. Our rule is that "the BIA

---

[4]The panel, however, ultimately found that even accepting Mansour's testimony as true, he had not demonstrated past persecution. *Mansour*, 390 F.3d at 673.

may not require independent corroborative evidence from an asylum applicant who testifies *credibly* in support of his application." *Kataria*, 232 F.3d at 113. This rule, however, turns on a determination that an applicant's testimony is credible. We explained in *Chebchoub*:

> "Because asylum cases are inherently difficult to prove, an applicant may establish his case through his own testimony alone." . . . That is, Chebchoub's testimony, if credible, *may* be sufficient to sustain his burden of proof without corroboration. . . . However, 8 C.F.R. § 208.13 plainly indicates that if the trier of fact either does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be fatal to his asylum application. Thus, the regulations unambiguously contemplate cases where an applicant's testimony alone will not satisfy his burden of proof.

257 F.3d at 1042 (internal citations omitted).

This case presents an instance where an applicant, who has been criminally convicted at least three times for lying, seeks asylum on the basis of his testimony alleging religious persecution which is inconsistent with the position he successfully presented to an IJ ten years earlier and for which he offers no corroborative evidence. Under these relatively unique circumstances, the IJ could not know "what to believe," and thus, even if not compelled to request corroborative evidence, cannot be faulted for doing so.

Finally, I note that our rulings that an IJ must make an explicit adverse credibility determination and that credible evidence may be sufficient to support an asylum claim are based on sound concerns that are not applicable here. The IJ's determination that Tijani is not credible was not based on speculation or conjecture,[5] nor did the request for corroborat-

---

[5]For example, in *Shoafera v. INS*, 228 F.3d 1070, 1074 n.3 (9th Cir. 2000), which is cited in *Mansour*, 390 F.3d at 671, in support of the rule

ing evidence seek information that was presumptively beyond
Tijani's reach.[6] Instead, the IJ simply refused to accept the

---

against implied adverse credibility determinations, the court explained:

> As we explained in *Canjura-Flores v. INS*, 784 F.2d 885, 888-89
> (9th Cir. 1985), without an adverse credibility finding we accept
> a petitioner's testimony as credible because "[a]ny other rule
> would put us in the position of second-guessing the credibility of
> the petitioner on appeal when no doubts have been raised by the
> Immigration Judge or the Board." Consequently, the IJ "must
> have 'a legitimate *articulable* basis to question the petitioner's
> credibility,' " and must express "a specific, cogent reason for any
> stated disbelief." *Garrovillas* [v. INS], 156 F.3d [1010] at 1013
> [(9th Cir. 1998)] (emphasis added) . . . . Indeed, any such reasons
> for doubting a petitioner's credibility must be "substantial and
> must bear a legitimate nexus to the finding." *Id.* (citation omit-
> ted); *Akinmade v. INS*, 196 F.3d 951, 954 (9th Cir. 1999); *Turcios
> v. INS,* 821 F.2d 1396, 1399 (9th Cir. 1987). "Generalized state-
> ments that do not identify specific examples of evasiveness or
> contradiction in the petitioner's testimony" are insufficient. *Gar-
> rovillas,* 156 F.3d at 1013.

Here, the IJ had "a legitimate articulable basis for questioning" Tijani's
credibility, the IJ explicitly stated his reasons, the reasons are substantial,
and they bear a legitimate nexus to the IJ's fact-finding mission.

[6]For example, in *Smolniakova v. Gonzales*, 422 F.3d 1037, 1047 (9th
Cir. 2005), we held that the IJ committed legal error in holding that
"Smolniakova's credibility was undermined by her failure to corroborate
her testimony about the May 1991 attack with a letter from the stranger
who witnessed the assault." The court held that "it is unreasonable to
expect Smolniakova to have obtained a corroborating letter from an
unidentified stranger." *Id.* Similarly, in *Bolanos-Hernandez v. INS*, 767
F.2d 1277, 1285 (9th Cir. 1984), we held that an applicant cannot be
required to present independent corroborative evidence of a specific threat
to his life, and concluded that "[a]uthentic refugees rarely are able to offer
direct corroboration of specific threats."

Here, however, the IJ only sought some corroboration of Tijani's claim
that he was attacked and injured while visiting his mother in Nigeria
because of his conversion to Christianity. The corroboration could have
been in the form of a letter or affidavit from his mother or his brother, or
hospital records, or even statements from acquaintances that Tijani had the
injury when he returned to the United States. Tijani offered no evidence
of his claim other than his word, but due to his past misrepresentations,
his word is not entitled to any presumption of credibility.

unsupported testimony of an applicant who has several criminal convictions for lying and who proffered a claim of religious persecution that was inconsistent with the claim he had presented to an IJ ten years earlier. Because Tijani's unsupported testimony was not entitled to any presumption of credibility, I would find that the IJ did not err in requiring that he produce some corroborative evidence.

This case tests the extremes to which our precedent can be stretched. My colleagues appear to reason that because the IJ's adverse credibility determination was not sufficiently explicit, Tijani's testimony must be taken as true, and that because his testimony must be accepted as true, the IJ could not require corroborative evidence. In other words, contrary to the fable, in the Ninth Circuit, it does not matter how often an asylum applicant cries wolf, each new cry for relief must be treated as true because to do otherwise is arguably speculative and conjectural.[7] Even assuming that our precedent could be stretched to this point, I dissent because it should not be.

D. *Conclusion*

Tijani has been convicted of four crimes since he came to the United States. After the first two, he prevailed upon an IJ to grant him a waiver of deportation because he had converted to Christianity and feared persecution if he returned to Nigeria. Tijani continued to commit frauds and after two more convictions, the government again sought his removal to Nigeria. Tijani now claims, based only on his unsupported testimony, that he became a Christian in 1994, and that when he visited his mother in Nigeria in 1995 and told her he had

---

[7]It should be remembered that in the fable, the last time the boy cried wolf there really was a wolf, but the people ignored the cry. Thus, if those who had heard the call had not discounted the cry based on past events and had investigated the last cry, the boy might have been saved. The moral, however, is that society does not have any obligation to investigate the unsupported claim of a person who has repeatedly confirmed that he is a liar.

converted to Christianity, he was attacked and injured by "a group of Sharia police officers and regular civil police officers." I agree with the IJ that Tijani's record of lying to the courts in this country coupled with his revision of when he allegedly became a Christian is sufficient to strip his testimony of any credibility. Accordingly, the IJ properly required Tijani to provide some corroboration of his testimony, and properly denied him relief when he failed to do so. The petition for review should be denied.